2026 UT App 12

# THE UTAH COURT OF APPEALS

WELLSKY CORPORATION,
Petitioner,

*v.*

PROCUREMENT POLICY BOARD AND UTAH DIVISION OF PURCHASING
AND GENERAL SERVICES,
Respondents.

Opinion
No. 20250869-CA
Filed January 29, 2026

Original Proceeding in this Court

Christopher R. Hogle and Courtney Thompson,
Attorneys for Petitioner

Derek E. Brown, Andrew Dymek, and Steve Geary,
Attorneys for Respondents

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

HARRIS, Judge:

¶1      The Utah Division of Purchasing and General Services (the Division), as the lead procurement agency for a consortium of state agencies, solicited bidders for a contract to provide cloud and software services. WellSky Corporation (WellSky), a software and technology company, submitted a proposal that ended up being rejected because it received a score that was too low. WellSky appealed its rejection first to the Chief Procurement Officer (the Officer) and then to an appeals panel of the Procurement Policy Board (the Board). After two rounds of appeals, WellSky's protest was ultimately rejected. WellSky now seeks judicial review of the Board's final decision, arguing chiefly that the protest process was infirm because WellSky did not receive a hearing. After considering the arguments, we conclude

that, under the terms of the governing statute, WellSky was entitled to a hearing on its protest, and because it did not receive one, we set aside the Board's decision and send this matter back so that a hearing before the Officer can be held.

## BACKGROUND

¶2    In November 2024, the Division issued a Request for Proposals (RFP) seeking applications from vendors interested in providing cloud and software services to government agencies. The proposal evaluation process involved five stages. Vendor proposals were initially evaluated under the first three stages, and if a vendor's proposal passed these stages, the vendor would then be invited to submit responses for the final two stages. A vendor's submission was assessed by members of an evaluation committee. The scoring procedure involved a few nuances relevant to WellSky's protest, and for context, we provide here a summary of the relevant parts of that procedure.

¶3    To pass the third stage, the RFP required a vendor's proposal to obtain a minimum score of 70%. That score was the sum of individual scores from the following sections: cover letter, executive summary, general requirements, business profile, scope of experience, financials, and contract management. While each section was assigned a single possible point total, each section included various subsections that did not indicate any required or possible point allocation.

¶4    The evaluation committee assigned scores for each of the seven sections on a 1-to-5 scale, and vendors were informed that "scoring is subjective and reflects the evaluators' professional judgment."[1] Each proposal would "be scored by at least three

---

1. This information was not in the RFP itself but was found on the Division's website. The RFP advised vendors to "check [the website] for answered questions . . . before the closing date."

evaluator committee members," whose scores would be averaged to obtain a "consensus score." Notably, vendors were informed that they would receive a score of 3 if their proposal "address[ed] all requirements or criteria in the RFP satisfactorily," and that they would receive a passing score of 4 or 5 only if their proposal not only "address[ed] all requirements or criteria" but also "exceed[ed]" at least some of them. A score of 3 would result in 60% of the possible points and would fall below the requisite 70% minimum threshold.

¶5 WellSky submitted a response to the RFP, but its submission did not receive a high enough score—its consensus score was 61%—to pass the third stage of the evaluation. Two days after learning of its score, WellSky submitted a records request to the Division pursuant to the Government Records Access and Management Act (GRAMA), Utah Code § 63G-2-103 to -901, asking for copies of "all records regarding the evaluations of submissions and proposals submitted in response to" the RFP, "including any records prepared by, or for, any or all members of the evaluation team." The next day, the Division denied WellSky's request, citing the provision of GRAMA pertaining to protected procurement records, *see id.* § 63G-2-305(6), and stating that "the requested records are protected until after the contract(s) has been awarded and signed by all parties."

¶6 WellSky also filed a protest with the Officer, contesting the Division's rejection of its proposal. In its protest, WellSky asserted that its score "show[ed] that the Division failed to correctly apply the RFP requirements and scoring criteria, applied requirements and criteria that were not identified in the RFP, and applied requirements and criteria in an unduly restrictive and anti-competitive manner," in violation of Utah's procurement statutes. In support, WellSky addressed each of its individual section scores. For example, WellSky contested its 60% score for the cover letter, arguing that it "substantially and materially satisfied" the six criteria for this section, even while "acknowledg[ing] that its

response inadvertently omitted" at least part of one of the criteria. After addressing the remaining sections, WellSky argued that its response to the RFP demonstrated "capability, experience, and stability sufficient to enable further evaluation of WellSky's" services and that its score should be "based solely on the criteria identified in the RFP." WellSky asked that it be allowed to proceed to the next stage of the RFP process, and, among other things, it requested a hearing before the Officer.

¶7 The Officer dismissed the protest without holding a hearing. In her written decision, the Officer found that the Division had "adhered to the Utah Procurement Code, administrative rules, and solicitation requirements during the procurement and in evaluating the responses submitted to the solicitation." The Officer explained that WellSky's argument for a higher score did "not qualify as a concise statement of grounds for a protest without specific facts and evidence." And the Officer concluded that "even considering the facts presented" as "true," WellSky "ha[d] not provided [an] adequate basis for the protest." (Citing *id.* § 63G-6a-1603(3)(a).)

¶8 WellSky appealed to the Board, arguing that the Officer did not adequately address the merits of its arguments and that the Officer's dismissal "without even holding a hearing [was] arbitrary and capricious and clearly erroneous." WellSky requested that its RFP response "be re-scored correctly, using only criteria expressed in the RFP," which it believed would result in WellSky advancing to the next stage of the procurement process. After review, the Board sustained WellSky's appeal. The Board offered its view that a "review of the [Officer's] written decision . . . does not show that WellSky's arguments regarding improper scoring were adequately addressed." The Board further explained that "a protestor providing relevant facts and evidence regarding scoring requires at a minimum the reviewer to determine that the scoring by the evaluation committee was supported by substantial evidence and was not arbitrary and capricious." From

its review of the Officer's decision, the Board "could not affirmatively find" that the Officer had determined that the scores were "supported by substantial evidence." Thus, the Board remanded the matter to the Officer "to take further action to review the record regarding the arguments presented by WellSky and render a new decision either denying or sustaining WellSky's appeal" (the Remand).

¶9 Following the Remand, the Officer issued another decision—again without holding a hearing—dismissing WellSky's protest (the Second Dismissal). The Officer stated that WellSky's "core assertion" was that it "should have scored more points." The Officer explained that she had reviewed the "solicitation, solicitation file, and evaluation scoring," and in her view, "the standards of review across the evaluation committee members were consistent with all vendors." She also stated that there was "no evidence that the evaluation committee scored WellSky any differently for the seven evaluation criteria than any other submitted response." After acknowledging that WellSky had requested a hearing as part of its protest, the Officer nevertheless found that "the record show[ed] that the evaluation committee's scoring was consistent using the stated evaluation criteria in the RFP." She also noted that a "protest may not include a request for an explanation of the rationale or scoring of . . . evaluation committee members." (Citing *id.* § 63G-6a-1602(6)(a).) And she concluded that "even the facts as alleged as true . . . do not provide an adequate basis for the protest because the record contains substantial evidence that supports the decision."

¶10 WellSky appealed to the Board again. WellSky repeated some of the arguments discussed above, but in addition, it argued that the Officer violated Utah law when she did not either uphold the protest or at least hold a hearing on the matter. In this vein, WellSky asserted that Utah's procurement statutes provide only three options to a protest officer when addressing a protest in the first instance: (1) dismiss the protest without a hearing if the

protest alleges facts that, if true, do not provide an adequate basis for the protest; (2) uphold the protest without a hearing if the undisputed facts indicate that the protest should be upheld; or (3) hold a hearing if there is a genuine issue of material fact or law that needs to be resolved. (Citing *id.* § 63G-6a-1603(3).) WellSky argued that the Remand had effectively foreclosed the first option, leaving only the latter two options available to the Officer: uphold the protest or hold a hearing. Thus, WellSky argued that the Officer had acted contrary to statute when she dismissed the protest, without holding a hearing, based on her own assessment of the evidence in the record. Apparently frustrated with the Officer's repeated dismissals, WellSky told the Board that, "[r]ather than simply remand this matter again for the . . . Officer to decide WellSky's protest a third time, [it] should consider the merits of WellSky's protest."

¶11 Later, the Board issued a second decision, this time concluding that the Second Dismissal was supported by substantial evidence and was not "arbitrary and capricious." The Board noted that there "were a number of vendors responding to the RFP (more than 200), with six individuals reviewing all of these RFP proposals while attempting to remain consistent with their scoring." The Board also noted that "[i]t was also apparent that the bar for disqualifying vendors" was purposely "high," "to winnow out otherwise qualified candidates." Based on its own review, the Board explained that "the evaluation committee closely scrutinized all submitted responses" and that "the scoring by the six scoring individuals shows that the RFP scoring was subjective, but was not arbitrary and capricious, or clearly erroneous." The Board thus dismissed WellSky's appeal.

¶12 WellSky timely filed a petition for judicial review with this court. Before filing its opening brief, WellSky filed a motion, pursuant to rules 11 and 18 of the Utah Rules of Appellate Procedure, asking permission to supplement the record. In that motion, WellSky argued that the record on appeal was

"materially incomplete and lack[ed] fundamental documents that were part of the solicitation file and [bore] directly on WellSky's claims in this procurement protest appeal." WellSky argued that it was entitled to "all documentation and other evidence the [Officer] relied upon in reaching [her] decision." (Quoting *id.* § 63G-6a-1601.5(3).) And WellSky pointed to the Officer's statement that, in reaching her conclusion "that evaluation criteria were consistently applied across all vendors," she had reviewed "the solicitation, solicitation file, and evaluation scoring." WellSky argued that "[c]ritical to this appeal would be correspondence between agency personnel regarding RFP submissions and evaluations, evaluator notes, and emails related to the evaluation process."

¶13   The Division filed an opposition to the motion, arguing that "all" the documents that the Officer had actually "relied upon" in dismissing WellSky's protest were already part of the protest appeal record. The Division further argued that "[r]equiring the Board to supplement the record with the entire solicitation file would give WellSky access to a vast amount of sensitive information that is entirely irrelevant to WellSky's protest and this appeal."

¶14   In support of its position, the Division submitted a sworn declaration from the Officer in which she averred, among other things, that the "record . . . provided to the [c]ourt contains all the documents that [she] relied upon . . . in reaching [her] decisions concerning WellSky's protest." The Officer clarified that, in this case, her reference in the Second Dismissal to having "'review[ed] . . . the solicitation file'" did not mean that she actually "relied upon every document in the solicitation file." Rather, the Officer declared that she "reviewed the solicitation file by listing the documents in the file," not by opening, reviewing, or reading the contents of every document in the solicitation file. She also averred that she did not rely upon any "evaluator notes" or emails in reaching her decision and that, in any event, the solicitation file

"d[id] not contain any evaluator notes," "emails," "or similar documents from WellSky's Stage 3 evaluation." Finally, the Officer stated that she had not relied upon any other vendors' proposals in reaching her decision.

¶15   As discussed more fully in Part II, below, we denied WellSky's motion to supplement the record, and the parties filed their briefs according to the briefing schedule.

ISSUES AND STANDARDS OF REVIEW

¶16   In its petition, WellSky argues that the Board erred when it affirmed the Officer's decision, and WellSky takes specific issue with the Officer's "fail[ure] to hold a hearing and examine readily available evidence within the Division's exclusive control bearing directly on whether the evaluation committee applied undisclosed scoring criteria or misapplied the RFP's published criteria." It also takes issue with the contents of the record that has been submitted to us.

¶17   With regard to the merits of a decision rendered by the Board, we will disturb that decision only if it was "arbitrary and capricious or clearly erroneous." Utah Code § 63G-6a-1802(4)(c). An agency's decision is arbitrary and capricious if "it is not supported by substantial evidence in the record." *Staker v. Town of Springdale*, 2020 UT App 174, ¶ 24, 481 P.3d 1044 (cleaned up); *accord Bradley v. Payson City Corp.*, 2003 UT 16, ¶¶ 10, 23, 70 P.3d 47. And a decision is supported by substantial evidence if, after "consider[ing] all the evidence in the record, both favorable and contrary," we determine that "a reasonable mind could reach the same conclusion" as the administrative decisionmaker. *Staker*, 2020 UT App 174, ¶ 24 (cleaned up).

¶18   But an agency's interpretation of a statute is reviewed without deference. *See Hughes Gen. Contractors, Inc. v. Utah Labor Comm'n*, 2014 UT 3, ¶ 25, 322 P.3d 712 ("[W]e have retained for

the courts the de novo prerogative of interpreting the law, unencumbered by any standard of agency deference."); *see also Ellis-Hall Consultants v. Public Serv. Comm'n*, 2016 UT 34, ¶ 27, 379 P.3d 1270 ("[A]gency decisions premised on pure questions of law are subject to non-deferential review for correctness.").

## ANALYSIS

### I. The Protest Process

¶19    WellSky first argues that it was entitled to a hearing on its protest. For the reasons discussed below, we agree with WellSky, set aside the Board's decision, and send this matter back for further proceedings, including a hearing before the Officer.

¶20    Utah's procurement statutes—which govern WellSky's petition for review—allow a losing applicant for a state contract to challenge a denial by filing a protest with a designated officer. *See* Utah Code § 63G-6a-1602(1). Relevant statutes provide six grounds upon which a protestor may object to an agency's decision, provided that "facts and evidence" exist that, "if true," support the objections. *See id.* § 63G-6a-1602(4)(b). Among other grounds, a losing applicant may protest if the evaluation committee "fail[ed] to correctly apply or calculate a scoring criterion." *Id.* § 63G-6a-1602(4)(b)(v).

¶21    If a protest is timely filed and otherwise compliant, *see id.* § 63G-6a-1603(1)–(2), Utah law mandates that a "protest officer shall" take one of the following three options:

> (a) dismiss the protest without holding a hearing if the protest officer determines that the protest alleges facts that, if true, do not provide an adequate basis for the protest;

> (b) uphold the protest without holding a hearing if the protest officer determines that the undisputed facts of the protest indicate that the protest should be upheld; or
>
> (c) hold a hearing on the protest if there is a genuine issue of material fact or law that needs to be resolved in order to determine whether the protest should be upheld.

*Id.* § 63G-6a-1603(3). In this opinion, we will refer to the individual subsections of this statute as "subsection (a)," "subsection (b)," and "subsection (c)." As currently written, the statute makes no other options available to the protest officer at this stage of the process. *See id.*

¶22    Our appellate courts have not had occasion to interpret the language of these three subsections. When we interpret a statute, the purpose "is to ascertain the intent of the legislature." *In re adoption of B.H.*, 2020 UT 64, ¶ 31, 474 P.3d 981 (cleaned up). And the best evidence of legislative intent is the language our legislature used to express that intent. *See Hertzske v. Snyder*, 2017 UT 4, ¶ 10, 390 P.3d 307. "When we can ascertain the intent of the legislature from the statutory terms alone, no other interpretive tools are needed, and our task of statutory construction is typically at an end." *Scott v. Scott*, 2017 UT 66, ¶ 22, 423 P.3d 1275 (cleaned up).

¶23    With those principles in mind, it is apparent from the plain language of the statute that the actions available to the protest officer have kindred analogues in our rules of civil procedure. *Compare* Utah Code § 63G-6a-1603(3)(a), *with* Utah R. Civ. P. 12(b)(6); *compare* Utah Code § 63G-6a-1603(3)(b)–(c), *with* Utah R. Civ. P. 56. Subsection (a) allows the protest officer to dismiss a protest without a hearing when the losing applicant "*alleges* facts that, *if true*, do not provide an adequate basis for the protest." Utah Code § 63G-6a-1603(3)(a) (emphasis added). This procedure

limits the protest officer's examination to the allegations made by the protestor; it does not appear to allow for consideration of the actual evidence in the case. *See id.* Indeed, under this option, the protest officer must assume the truth of the protestor's allegations. *See id.* In this way, the procedure of subsection (a) is similar to the process required under rule 12(b)(6) of the Utah Rules of Civil Procedure, which allows a court to dismiss a case "when, assuming the truth of the allegations that a party has made and drawing all reasonable inferences therefrom in the light most favorable to that party, it is clear that the party is not entitled to relief." *Calsert v. Estate of Flores*, 2020 UT App 102, ¶ 9, 470 P.3d 464 (cleaned up); *see also Pace v. Link Debt Recovery LLC*, 2024 UT App 4, ¶ 12, 542 P.3d 979 (explaining that, on a rule 12(b)(6) motion, a court "must accept the material allegations of the complaint as true" and dismiss the case "only if it clearly appears the complainant can prove no set of facts in support of his or her claims" (cleaned up)), *cert. denied*, 547 P.3d 829 (Utah 2024).

¶24 Subsection (b) permits a protest officer to "uphold" a protest without a hearing if the "undisputed facts of the protest indicate that the protest should be upheld." Utah Code § 63G-6a-1603(3)(b). This option allows the protest officer to look beyond the allegations made and to examine the actual evidence to see if the facts are "undisputed." *Id.* If they are, and if those facts compel a resolution in the protestor's favor, then the protest officer should uphold the protest. *See id.* This process is similar to the one available under rule 56 of the Utah Rules of Civil Procedure, in which a court may grant a motion for summary judgment "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a); *see also Turley v. Childs*, 2022 UT App 85, ¶ 27, 515 P.3d 942 (explaining that a motion for summary judgment can be granted if the "motion and supporting materials—including the facts considered undisputed—show that the moving party is entitled to judgment as a matter of law" (cleaned up)). It is important to note, however, that subsection (b)

does not allow the protest officer to *dismiss* the protest based on undisputed facts; it speaks only of "uphold[ing] the protest." Utah Code § 63G-6a-1603(3)(b).

¶25    Finally, subsection (c) requires a protest officer to hold a hearing on the matter if "there is a genuine issue of material fact or law that needs to be resolved." *Id.* § 63G-6a-1603(3)(c). This action calls to mind the trial that must be held, in district court, if summary judgment is not warranted under rule 56. *See Jackson v. Dabney*, 645 P.2d 613, 615 (Utah 1982) ("[A] motion for summary judgment should be denied where the evidence presents a genuine issue of material fact which, if resolved in favor of the nonmoving party, would entitle [that party] to judgment as a matter of law."). But this action is not identical to the denial-of-summary-judgment procedure; indeed, under the terms of the relevant statute, subsection (c) is the only subsection available to a protest officer if the officer assesses the evidence and finds that the *facts* (as opposed to the *allegations made*)—whether disputed or not—preclude a ruling in the protestor's favor. *See* Utah Code § 63G-6a-1603(3)(c). In particular, subsection (c) applies when neither of the other two subsections do and where there is a "genuine issue . . . of law that needs to be resolved." *Id.*

¶26    In this case, WellSky submitted a protest in which it alleged that "the Division failed to correctly apply the RFP requirements and scoring criteria, applied requirements and criteria that were not identified in the RFP, and applied requirements and criteria in an unduly restrictive and anti-competitive manner." More particularly, in its protest WellSky asserted that, with regard to each individual section of its proposal, some criteria other than those listed in the RFP must have existed to guide the evaluators' scores. Among other things, WellSky pointed to its 60% score for the cover letter, arguing that it had "substantially and materially satisfied" the six criteria for this section, even while "acknowledg[ing] that its response inadvertently omitted" at least part of one of the criteria. WellSky posited that such a

substantial score deduction for missing only one half of one criterion indicated that an undisclosed rubric may have existed. And WellSky advanced similar arguments for the remaining individual section scores.

¶27　If these allegations were true, this would be an adequate basis for a protest under the governing statutes, which allow protests based on, among other things, "facts and evidence that, if true, would establish" "a failure to correctly apply or calculate a scoring criterion." *See id.* § 63G-6a-1602(4)(b)(v). Thus, we agree with WellSky that subsection (a) wasn't a viable option for the Officer to take because WellSky's protest alleged facts that—if true—would have provided an adequate basis to challenge the dismissal of WellSky's proposal.[2] As already noted, the plain text of subsection (a) limits a protest officer to examination of the allegations, and it does not contemplate examination of the actual facts of the case. Thus, with subsection (a) off the table, the Officer was left with two options: uphold the protest under subsection (b) if the undisputed facts supported that outcome, or hold a hearing on the protest under subsection (c).

¶28　But subsection (b) wasn't a viable option either, as demonstrated by the Officer's and the Board's analyses. Subsection (b) allows a protest officer to consider evidence without a hearing, which the Officer and the Board did in this case. But, critically, the result can only be to *uphold* the protest, not

---

2. WellSky argues that the Remand itself foreclosed the Officer's ability to dismiss the protest under subsection (a). We take WellSky's point, but we ultimately need not make a decision on the merits of this argument, because we agree with WellSky on the broader contention that—for the reasons discussed herein—subsection (a) was not an option for the Officer here.

to dismiss it. *See id.* § 63G-6a-1603(3)(b).[3] Yet both the Officer and the Board assessed the evidence without a hearing en route to dismissing the protest. The governing statute, as currently written, does not allow for this option. Indeed, the statute leaves the protest officer with no discretion in this regard: "the protest officer *shall*" take one of the three specified actions. *See id.* § 63G-6a-1603(3) (emphasis added). Where the statute plainly limits the options for a factfinder or adjudicator, we apply the statute according to its terms. *See, e.g.*, *In re A.S.G.-R.*, 2023 UT App 126, ¶ 48, 538 P.3d 1259 (explaining that under the termination of parental rights statute, "[t]he language . . . speaks of only three options, and requires the court" to choose one).

¶29    That left but one option for the Officer to take: hold a hearing pursuant to subsection (c) and consider the facts. This is the only option available to a protest officer who believes that the facts—even if undisputed—compel dismissal of a protest. Because neither subsection (a) nor subsection (b) applies here, and because a hearing was not held, the Board's decision to affirm the Officer's action was procedurally incorrect and contrary to the governing statute. While we will disturb an agency's decision only when the decision is "arbitrary and capricious or clearly erroneous," Utah Code § 63G-6a-1802(4)(c), an agency's interpretation of a statute is reviewed without deference, *see supra*

---

3. We note here the statute's lack of symmetry in this regard. Subsection (b) permits the protest officer to *uphold* the protest without a hearing if the undisputed facts so indicate, but the protest officer cannot *dismiss* a protest—at least not without a hearing—if the undisputed facts so indicate. *See* Utah Code § 63G-6a-1603(3). Indeed, as noted, the statute offers only three options to a protest officer in this context. *Id.* To the extent our legislature intended for additional options to be available to a protest officer, we would invite the legislature to consider amending the statute.

¶¶ 17–18. Given the Board's departure from the actions permissible under the law, we must set aside the Board's decision.

¶30    The Division resists this conclusion, arguing that WellSky "invited error" by asking the Board, during its second appeal, to address the protest on its merits rather than remand the case again for a hearing. We disagree.

¶31    As an initial matter, WellSky in its second appeal made its position very clear: subsection (a) didn't apply, and therefore the only way the Board could affirm dismissal of its protest was through subsection (c), which required a hearing. Indeed, WellSky asserted that subsections (b) and (c) were "the only ones available to" the Officer, and that the Officer's decision was improper because she "follow[ed] neither one" and "neither upheld the protest nor held a hearing."

¶32    To be sure, on the same page of its written submission, WellSky expressed frustration with the Officer, complaining that "[t]wo times now the [Officer] has failed to adequately address WellSky's protest." And it asked the Board to essentially take the process over and to just "consider the merits of WellSky's protest" without sending the matter back to the Officer. But we do not construe this argument as a request that the Board ignore subsection (c) and dispose of the case before a hearing could be held. Indeed, WellSky appeared to suggest that the Board—and not the Officer—should hold any required hearing, arguing at one point that "[t]he [procurement] [c]ode requires *the Board* to 'consider and decide the appeal based solely on,'" among other things, "'responses received during an informal hearing, if an informal hearing is held.'" (Quoting *id.* § 63G-6a-1702(7) (emphasis added).) And WellSky concluded its argument along these lines by asserting that the Second Dismissal was "clearly erroneous" because, among other reasons, the decision "fail[ed] to follow the Board's instructions" in the Remand and failed to follow section "63-6a-1603(3)," the statutory provision setting

forth the Officer's three options. As we interpret WellSky's position, it was asking the Board to either issue a subsection (b) ruling upholding its protest on undisputed facts, or hold the required subsection (c) hearing itself so that it could more comprehensively consider the facts. We therefore see little support for the Division's contention that WellSky invited error by telling the Board not to hold a hearing. On that basis, we reject the Division's invited error argument.[4]

¶33 For these reasons, we set aside the Board's decision and return the case to the Division for further proceedings, including a hearing under subsection (c) in accordance with the governing statutory framework. *See id.* § 63G-6a-1603(4)–(11) (providing the rights and responsibilities of the protest officer and protestor in a protest hearing). By returning this matter for further proceedings, we offer no opinion as to the ultimate merits of WellSky's protest; we determine only that WellSky's protest was prematurely dismissed because no hearing was held.

## II. The Protest Appeal Record

¶34 While WellSky's petition for judicial review primarily targets the denial of a hearing under subsection (c), a throughline in WellSky's arguments centers on the purportedly incomplete "protest appeal record." Specifically, WellSky argues that the Officer based "her decision on cherry-picked portions of the

---

4. For similar reasons, we reject the Division's similar argument that WellSky did not preserve the issue of whether the Board erred by not remanding the matter a second time for a hearing. As noted, WellSky argued in its second appeal that the Officer "had three options under Utah Code [section] 63G-6a-1603(3)" and that only two of those options remained: upholding the protest or holding a hearing. In this way, WellSky clearly advanced the argument that the statute limited the Officer's actions to just three choices and that the Officer erred by choosing none of them.

solicitation file and refus[ed] to hold a hearing," while "the Division was simultaneously denying WellSky access to its solicitation file." As a consequence, WellSky argues that at "no time when WellSky's protest was pending in the Division (either before [the Officer] or the Board) was WellSky allowed to see any portion of the solicitation file that the [Officer] reviewed or relied upon to deny WellSky's protest."

¶35     Because we dispose of this judicial review proceeding by setting aside the Board's order and returning the case for further action, the protest appeal record related to this review proceeding has run its course. And should there be a second request for judicial review in this matter, the protest appeal record in that proceeding will almost certainly be somewhat different from the one associated with this proceeding. Nevertheless, because these issues might come up in future proceedings in this case, we take the opportunity here to address some of WellSky's record-based arguments and explain why we denied its motion to supplement. *See State v. Valdez*, 2021 UT App 13, ¶ 54, 482 P.3d 861 (providing "guidance that might be useful on remand, where [the] issues are likely to arise again"), *aff'd*, 2023 UT 26, 552 P.3d 159.

¶36     We emphasize at the outset that development of the protest appeal record is governed by statute (and not by the rules of civil procedure) and that, as a result, the record-development process in procurement protest cases is not the same as in an appeal from a judgment in district court. And as explained in more detail below, in procurement protest cases a protestor's entitlement to documents and records is substantially limited.

¶37     Two different statutes contain related guardrails in this regard. For starters, GRAMA includes a provision specifically for procurement records. *See* Utah Code § 63G-2-305(6). It provides for the protection of "records, the disclosure of which would impair governmental procurement proceedings or give an unfair advantage to any person proposing to enter into a contract or

agreement with a governmental entity," and it mandates that only "after the contract or grant has been awarded and signed by all parties" will *some* specified records be available. *Id.*

¶38 Moreover, the procurement statutes themselves contain limitations—tied to this GRAMA provision—on a protestor's entitlement to the contents of a solicitation file. Specifically, a "protest may not include a request for . . . the disclosure of a protected record or protected information in addition to the information provided under the disclosure provisions of this chapter." *Id.* § 63G-6a-1602(6)(b). And a "procurement unit . . . may not disclose the contents of a proposal to the public *or to another offeror*, except as provided in" the GRAMA provision quoted above. *Id.* § 63G-6a-704(1)(c) (emphasis added).

¶39 With this background, we turn to the statutory definition of "protest appeal record," which is the operative provision that governs here. *Id.* § 63G-6a-1601.5(3). Per statute, the protest appeal record consists of the following items:

> (a) a copy of the protest officer's written decision;
>
> (b) all documentation and other evidence the protest officer *relied upon* in reaching the protest officer's decision;
>
> (c) the recording of the hearing, if the protest officer held a hearing;
>
> (d) a copy of the protestor's written protest; and
>
> (e) all documentation and other evidence submitted by the protestor supporting the protest or the protestor's claim of standing.

*Id.* (emphasis added).

¶40 In this case, WellSky asserts that the record submitted to us was "materially incomplete and lack[ed] fundamental documents that were part of the solicitation file and bear directly on WellSky's claims in this procurement protest appeal." WellSky argues that it was entitled to "all documentation and other evidence the protest officer relied upon in reaching the protest officer's decision." (Quoting *id.* § 63G-6a-1601.5(3).) And in turn, WellSky points to the Officer's statement that, in reaching her conclusion "that evaluation criteria were consistently applied across all vendors," she reviewed "the solicitation, solicitation file, and evaluation scoring." WellSky argues that "correspondence between agency personnel regarding RFP submissions and evaluations, evaluator notes, and emails related to the evaluation process" would be "[c]ritical to this appeal." And it asserts that, because these documents were not contained in the record submitted to us, supplementation of the record was necessary.

¶41 In a previously entered order, we rejected WellSky's argument. The relevant statute uses the phrase "relied upon"; it does not use words like "reviewed" or "considered." *See id.* § 63G-6a-1601.5(3)(b). While the Officer may have *reviewed* many documents contained within the solicitation file in rendering the Second Dismissal, she later clarified, in a sworn declaration, that she had *relied* only upon specific documents, all of which became part of the protest appeal record submitted to us. And she clarified that, in reaching her decision, she did not rely upon the entirety of the solicitation file, or upon any "evaluator notes" or emails, or upon any other vendors' proposals. The Officer averred that she relied only upon the records that are contained in the protest appeal record. And given this sworn declaration, we concluded that the protest appeal record submitted to us is complete and that no supplementation was warranted.

¶42 WellSky argues that it was entitled to more records than what the Officer claims to have relied upon in rendering the Second Dismissal; it asserts that the Officer should not be free to

"cherry-pick" the documents contained in the record and thus shield the rest of the procurement file from WellSky's view. WellSky asserts that "[t]his dual approach—turning a blind eye to the portions of the [procurement] file that would bear most directly [on] WellSky's protest and withholding them from WellSky—skews the 'record' and deprives [the court] of a complete record with which to review the Board's" decision.

¶43 We understand the basis of this argument. And we acknowledge that, for parties used to litigating in court under the usual rules of discovery, this procedure might seem constricted and insufficient. After all, the discovery and record-development rules governing appeals from district court are far broader than this. *See* Utah R. Civ. P. 26(b)(1) (allowing parties to "discover any matter, not privileged, which is relevant to the claim or defense of any party if the discovery satisfies the standards of proportionality"); Utah R. App. P. 11(a) ("The record on appeal consists of the documents and exhibits filed in or considered by the trial court, . . . and the transcript of proceedings, if any."). But in this unique context, the procurement statutes—and not our rules of civil procedure—govern both the protest action itself *and* the records available to the protestor on appeal. *See* Utah Code §§ 63G-6a-1601.5(3) (defining "[p]rotest appeal record"), -1602 (providing the process for filing a protest), -1701.5(2) (citing section 1601.5(3) for the definition of a protest appeal record for proceedings before the Board), -1802 (governing judicial review).

¶44 Under the governing statutes, records and documents in a procurement action are subject to specific limitations. *See supra* ¶¶ 37–39. And as applicable here, the key limitation imposed by our legislature is that the protest appeal record is to contain only those documents that "the protest officer *relied upon* in reaching [his or her] decision." *See id.* § 63G-6a-1601.5(3)(b) (emphasis added). So, under the statutory scheme, a protest officer, in compiling the protest appeal record, need only include the records that he or she relied upon in rendering a decision, along

with the other records specified in the statute's definition. *See id.* § 63G-6a-1601.5(3). The procurement statutes—for better or for worse—do not allow a protestor to test the veracity of the officer's record-compilation choice by gaining access to all documents in the solicitation file. In this statutory scheme, a protest officer—in compiling the protest appeal record—is able to make some choices that, in some quarters, might be seen as "cherry-picking." But allowing the protest appeal record to be compiled in this way is a policy choice, and WellSky does not suggest that other statutes or constitutional provisions operate to limit our legislature's policy choices in this regard. We are therefore not at liberty to second-guess the policy decision, made by our legislature, to impose (potentially quite serious) limitations on a protestor's ability to access the entire procurement file. WellSky's remedy, if it is dissatisfied with this statutory scheme, is to seek redress in the legislature.

¶45    WellSky also resists our conclusion by relying on *JLPR LLC v. Procurement Policy Board*, 2021 UT App 52, 492 P.3d 784, and arguing that the protest appeal record should have included everything in the solicitation file that the Officer *reviewed*. In so arguing, WellSky quotes a footnote from *JLPR*, in which we stated that the "protest appeal record transmitted to" the Board in that case "should have included the contents of the solicitation file that the [protest officer] reviewed in reaching his decision." *Id.* ¶ 21 n.6 (cleaned up). We are unpersuaded.

¶46    In *JLPR*, we addressed a different kind of protest appeal record issue than the one raised here; in particular, we did not address whether specific records belonged in the protest appeal record based on the officer's review or reliance on the record. *Id.* In that case, a protestor-appellant attempted to attach seventeen exhibits to its appellate briefs, but "almost none of the information contained in these attachments was in the administrative record submitted to the [protest officer] and to the Board." *Id.* ¶ 12. The protestor "did not include exhibits or attachments supporting its

arguments" in its initial protest "despite bearing the burden to provide facts and evidence supporting its claims." *Id.* ¶ 21. Thus, the "protest appeal record" "did not contain most of the materials" the protestor later attached to its appellate briefs. *Id.* In rejecting the protestor's attempt to include those documents in the record submitted to us, we explained that, rather than simply attaching the exhibits to the briefs, there was a proper channel through which the protestor could have supplemented the record—a channel that the protestor did not take. *See id.* ¶ 20 (explaining that "parties may not simply attach new documents to their appellate briefs without first obtaining permission to supplement the record on appeal").

¶47   We did note, however, that one of the attachments—the contract award justification record—should have been included in the protest appeal record. *See id.* ¶ 21 n.6. We explained in a footnote that the "protest appeal record transmitted to the Board should have included the contents of the solicitation file that the [protest officer] reviewed in reaching his decision." *Id.* (cleaned up). But we then explained that the agency had conceded that the award justification document should have been included in the protest appeal record. *See id.* And "[g]iven this concession," we considered the award justification document "to be part of the record on appeal, and a document that we may properly consider." *Id.* Whether that document had been relied upon (or, instead, merely reviewed) by the protest officer or the Board was not at issue in *JLPR*, and we took the agency at its word when it conceded that the document belonged in the protest appeal record. *See id.*

¶48   Here, by contrast, the Division asserts that the protest appeal record submitted to us already contains all the documents relied upon by the Officer and the Board. And the Division has supported this argument with the Officer's sworn declaration. The Division has not conceded that the protest appeal record is lacking in any way or that it should contain any of the records that

WellSky asserts should be part of the protest appeal record. And we clarify that our comment in *JLPR*—that "the protest appeal record transmitted to the Board should have included the contents of the solicitation file that the [protest officer] reviewed in reaching his decision," *see id.* (cleaned up)—should not be taken to mean that, in every case, the entirety of the procurement file should be included in the protest appeal record. As discussed, the contents of that file are dictated by statutory requirements, and— as relevant here—those requirements state that the protest appeal record includes not necessarily the whole file but only those items that "the protest officer *relied upon* in reaching" the decision at issue. *See* Utah Code § 63G-6a-1601.5(3)(b) (emphasis added).

¶49   In sum, the protest appeal record is defined by statute, and only records relied upon by the protest officer in rendering his or her decision are to be included in the protest appeal record, along with the other specified records. *See id.* § 63G-6a-1601.5(3). If a subsequent appeal to the Board or request for judicial review is undertaken in this case, these are the rules that should be followed in compiling the protest appeal record.

## CONCLUSION

¶50   The Officer and the Board dismissed WellSky's protest after considering evidence in the record but without holding a hearing. That action was not authorized by the statutes governing the procurement process. Accordingly, we set aside the Board's decision dismissing WellSky's protest and send the matter back to the Division for further proceedings, which should include a hearing. And in subsequent proceedings, the protest appeal record should be compiled consistent with the procurement statutes and this opinion.

————————